IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

IN THE MATTER OF            :
                            :
PENN CENTRAL TRANSPORTATION CO. :      NO. 70-347

MEMORANDUM

Bartle, J.                               August 28, 2012

On Sunday, June 21, 1970, at 5:40 p.m., Judge C.
William Kraft, Jr. of this court signed the petition of the Penn
Central Transportation Company ("PCTC") for reorganization under
§ 77 of the Bankruptcy Act of 1898, 11 U.S.C. § 205 (repealed
1978).  Order No. 1.  The matter was then assigned to Judge John
P. Fullam, who oversaw this massive proceeding for more than
forty years until April 15, 2011 when he ceased hearing cases.
Thereafter, it was transferred to the undersigned.

The reorganized company that emerged from the
reorganization proceedings in 1978 was known as The Penn Central
Corporation ("PCC" or the "Reorganized Company").[1]  It has now
moved for summary judgment, challenging its liability to 32
former employees of PCTC or their estates (the "Claimants") for a
$14,761,238 judgment entered against "the Penn Central" in the
United States District Court for the Northern District of Ohio.
The judgment confirms an arbitration award, as modified by the
Surface Transportation Board ("STB"), in favor of Claimants for

---

1.  In 1994, PCC changed its name to American Premier
Underwriters, Inc.

benefits and pre-judgment interest owed under a 1964 collective bargaining agreement. Claimants have filed a cross-motion for summary judgment in which they ask the court to enforce against the Reorganized Company the judgment entered in the Northern District of Ohio.

I.

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). A dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 254 (1986). Summary judgment is granted where there is insufficient record evidence for a reasonable jury to find for the non-movant. Id. at 252. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Anderson, 477 U.S. at 252. We view the facts and draw all inferences in favor of the non-moving party. Boyle v. Cnty. of Allegheny, 139 F.3d 386, 393 (3d Cir. 1998). When ruling on a motion for summary judgment, we may only rely on admissible evidence. See, e.g., Blackburn v. United Parcel Serv., Inc., 179 F.3d 81, 95 (3d Cir. 1999).

II.

There are no genuine disputes as to any material facts.
In 1962, the Pennsylvania Railroad Company and the New York
Central Railroad Company agreed to enter into a merger.  As
required by § 5(2)(f) of the Interstate Commerce Act, 49 U.S.C.
§ 5(2)(f), the two railroads and a union, the Brotherhood of
Railroad Trainmen, executed an "Agreement for Protection of
Employees in Event of Merger of Pennsylvania and New York Central
Railroads."  That agreement, referred to by the parties as a
Merger Protection Agreement or "MPA," was signed on November 16,
1964 but effective as of January 1, 1964.  It provided in § 1(b):

> On the date the said merger of [New York]
> Central [Railroad Company] into Pennsylvania
> [Railroad Company] is consummated the merged
> company will take into its employment all
> employees of Pennsylvania and Central as of
> the effective date of this Agreement ... who
> are willing to accept such employment, and
> none of the present employes [sic] of either
> of the said Carriers shall be deprived of
> employment or placed in a worse position with
> respect to compensation, rules, working
> conditions, fringe benefits or rights and
> privileges pertaining thereto at any time
> during such employment.

The MPA also stated in § 1(e) that if a dispute arose among the
railroads, the merged railroad, or the union with respect to
"interpretation or application" of the MPA, any party to the
agreement may refer the dispute to an arbitration committee "for
consideration and determination."  The MPA provided for the
appointment of arbitrators, one to be chosen by each party and a
neutral arbitrator chosen by the others.  The decision of the

-3-

majority, and in some instances, the decision of the neutral arbitrator alone, was to be "final and binding."

Following several years of proceedings before the Interstate Commerce Commission ("ICC"), the United States District Court for the Southern District of New York, and the Supreme Court, the railroads consummated their merger and formed PCTC on February 1, 1968.  See generally Penn-Cent. Merger & Norfolk & W. Inclusion Cases, 389 U.S. 486, 492-500 (1968). Twenty days later, on February 21, 1968, PCTC furloughed 29 employees of the Central Union Terminals Company ("CUTC"), a PCTC subsidiary operating in Cleveland, Ohio.  Prior to the merger, CUTC had been a subsidiary of the New York Central Railroad. PCTC did not pay these employees benefits under the MPA for time spent on furlough because, in its view, the MPA did not provide benefits to CUTC employees.  See Pa. R.R. Co.-Merger-N.Y. Cent. R.R. Co., 347 I.C.C. 536 (1974).  In 1969, 17 of the 29 furloughed employees filed a lawsuit against PCTC in the United States District Court for the Northern District of Ohio, Knapik v. Penn Central Co., No. 69-722, to obtain MPA benefits.[2]

---

2.   Ten of the seventeen Knapik plaintiffs were recalled to work during 1968 and 1969 and worked for PCTC until their retirement or death.  These ten plaintiffs are among the 32 Claimants now before this court.  The remaining seven plaintiffs in that lawsuit failed to respond to PCTC's recall notices.  In an arbitration convened in the Knapik case prior to the arbitration at issue here, an arbitration panel found those employees, including lead plaintiff Michael Knapik, were ineligible for MPA benefits.  That determination was ultimately affirmed by the STB and the Court of Appeals for the Sixth Circuit.  See Augustus v.
(continued...)

In January 1969, PCTC abolished the positions of six rate clerks who has been employees of the New York Central Railroad prior to the merger.  PCTC also denied MPA benefits to these six employees, and in 1969, they filed two separate lawsuits against PCTC in the Northern District of Ohio for such benefits.  These cases were captioned Watjen v. Penn Central Co., No. 69-675 and Bundy v. Penn Central Co., No. 69-947.

As noted, PCTC initiated a reorganization proceeding under § 77 of the Bankruptcy Act of 1898 in this court on June 21, 1970.[3]  From the date of the merger until shortly after the reorganization petition was filed, the MPA program was a significant expense.  Between February 1, 1968 and September 1970, PCTC paid over $87.7 million in MPA benefits.  Pa. R.R.

_____

2.(...continued)
Surface Transp. Bd., 238 F.3d 419, 2000 U.S. App. LEXIS 33966, at *7 n.2 (6th Cir. Dec. 22, 2000).

3.  Section 77 of the Bankruptcy Act of 1898, 11 U.S.C. § 205, governed bankruptcy proceedings of railroads until the enactment of the Bankruptcy Reform Act of 1978, Pub. L. No. 95-598, 92 Stat. 2549.  See Cent. Trust Co., Rochester, N.Y. v. Official Creditors' Comm. of Geiger Enter., Inc., 454 U.S. 354, 357 (1982).  Railroad reorganizations are now governed by Subchapter IV of Chapter 11 of the Bankruptcy Code, 11 U.S.C. §§ 1161-74.  Bankruptcy cases pending on the date the Bankruptcy Code took effect, October 1, 1979, are still governed by the Bankruptcy Act of 1898.  See Act of Nov. 6, 1978, Pub. L. No. 95-598, §§ 402(a), 403(a), 92 Stat. 2549, 2682-83; see also Cent. Trust Co., 454 U.S. at 357.  Certain provisions of the Bankruptcy Code did apply to § 77 reorganization proceedings in which the trustee had not filed a plan of reorganization prior to the date of enactment, November 6, 1978.  Act of Nov. 6, 1978 at § 403(b), 92 Stat. 2683.  As discussed below, the plan of reorganization in this case was filed, approved, and confirmed prior to that date.

Co.-Merger-N.Y. Cent. R.R. Co., 347 I.C.C. 536 (1974). August 28, 2012

In 1973, during the reorganization, this court approved a stipulation related to the Knapik case, one of the three Ohio lawsuits filed by the Claimants against PCTC in 1969.[4]  That stipulation (Doc. No. 5383) stated:

> IT IS HEREBY STIPULATED AND AGREED, by and between counsel for Michael J. Knapik, et al, plaintiffs in a civil action against Penn Central Transportation Company, et al, formerly pending in the United States District Court for the Northern District of Ohio, Eastern Division, and being action No. C69-722 on the docket of said Court, and counsel for Trustees of the Debtor, that the aforementioned civil action may be reinstated on the docket of said Court and may continue to a conclusion in said Court.  Provided, however, ... that no judgment which may hereinafter be entered in said civil action shall be enforced except as hereinafter authorized by this Court.

In 1974, while this reorganization proceeding was still pending, the ICC ruled that employees of PCTC subsidiaries, including CUTC, were entitled to merger protection benefits under the MPA.  Pa. R.R. Co.-Merger-N.Y. Cent. R.R. Co., 347 I.C.C. 536 (1974).  That same year, an additional 16 former CUTC employees sued PCTC in the Northern District of Ohio.  Sophner v. Penn

_____

4.  Neither side has identified an order in which this court specifically authorized the Watjen and Bundy actions against PCTC to continue.  Nevertheless, the judgment entered in 2011 by the United States District Court for the Northern District of Ohio, discussed below, leads us to conclude that those two cases did continue and have been litigated to conclusion.  See Watjen v. Penn Central, No. 69-675 (N.D. Ohio May 20, 2011) (order confirming arbitration award).

Cent. Co., No. 74-914 (N.D. Ohio).  These employees were
continuously employed by PCTC after the merger.  They alleged
that they were nevertheless entitled to MPA benefits and that
PCTC failed to pay them what was owed.  In 1975, this court
approved a stipulation regarding the Sophner lawsuit nearly
identical to the stipulation it approved two years earlier with
respect to the Knapik lawsuit.  Although allowing the action to
proceed to a conclusion in the Northern District of Ohio, it also
ordered that "no judgment which may hereafter be entered in the
Action shall be enforced except as authorized by this Court."
Doc. No. 8600.

          In the meantime, Congress enacted the Regional Rail
Reorganization Act of 1973 ("RRR Act") in an effort to prevent
the disruption or cessation of rail service in the Midwest and
Northeast as a result of many railroads, including PCTC, entering
reorganization.  RRR Act § 101, Pub. L. No. 93-236, 87 Stat. 985
(1974).  Among other things, the RRR Act established the
Consolidated Rail Corporation, commonly known as Conrail, and
required the trustees of the various railroads in reorganization
to sell the debtor railroads' assets to Conrail or other
profitable railroads.  RRR Act § 303(b), 45 U.S.C. § 743(b).  The
RRR Act also required Conrail to offer employment to the
employees of the railroads in reorganization, including PCTC, and
to assume liability for certain collective bargaining agreements
to which the railroads had been parties.  RRR Act §§ 502(b), 504,
45 U.S.C. § 772(b); see Moss v. Int'l Ass'n of Machinists &

Aerospace Workers, No. 92-3542, 1993 U.S. App. LEXIS 17219, 996
F.2d 1216 (6th Cir. June 30, 1993).

In accordance with the terms of the RRR Act of 1973,
PCTC's railroad employees became Conrail employees on April 1,
1976.  That same year, Congress added § 211(h) to the RRR Act.
See In re Penn Cent. Transp. Co., 596 F.2d 1127, 1133-35 (3d Cir.
1979); see also 45 U.S.C. § 721(h).  As explained by our Court of
Appeals, "Section 211(h) created a mechanism by which Conrail
borrowed from [the United States Railway Association, a federal
agency] in order to pay certain classes of the debtor's payables.
In turn, the estate was obligated to recognize as a current cost
of administration the amount of 211(h) funds expended by Conrail
on the estate's behalf."  In re Penn Cent. Transp. Co., 596 F.2d
at 1136.  In short, the PCTC Trustees paid certain labor expenses
with the government's money.  As a result, the government held
claims against PCTC possessing the "questionable virtues of
astronomic size and statutory priority."  Id. at 1136-37.

In September 1977, the PCTC Trustees drafted and
submitted to this court a report addressing executory contracts
arising from PCTC's pre-petition operations.  Doc. No. 14,122,
Order No. 3150.  The report began by quoting § 6.1 and § 6.2 of
the proposed PCTC plan of reorganization.  Those two sections
provided as follows:

> 6.1 Assumption of certain executory
> contracts.  Certain executory contracts, to
> be described in an exhibit hereto, which
> exhibit will be filed with the Court prior to
> its approval of the Plan, will be assumed by

-8-

the Reorganized Company subject in each
instance to the terms and conditions, if any,
of any disaffirmance by the Trustees.

6.2 Treatment of other executory
contracts.  In accordance with § 77(b) of the
Bankruptcy Act, all executory contracts of
the Debtor, with the exception of those
assumed in accordance with Section 6.1 of the
Plan, are rejected as of the date of the
filing of the petition for reorganization by
the Debtor provided that
(a) With respect to the executory
contracts of the Debtor heretofore assumed by
Conrail or other transferees pursuant to the
RRR Act, such rejection is deemed to be
rejection solely of the Debtor's and the
Trustees' remaining obligations and
liabilities, if any, under such contracts.

The categories of executory contracts that the Trustees desired

to affirm were listed in Exhibit I to the report.  The MPA is not

encompassed within any such category.

In ¶¶ 10 through 12 of the report, the Trustees note

that they originally reviewed all contracts with the goal of

affirming those that would be advantageous for the reorganized

company's operation as a railroad following bankruptcy.  They

then observed that "[t]he situation has now radically changed"

because most assets, including track, stock, and other equipment,

were transferred to other entities pursuant to the RRR Act.

Because the reorganized company that would emerge from bankruptcy

would not be in the railroad business, the Trustees concluded

that it was "desirable" to terminate all obligations under most

of the 175,000 existing executory contracts.

Following notice to potentially affected groups, the

court held a hearing on the Trustees' report on November 4, 1977.

Docket No. 14,122, Order No. 3150.  During that hearing, Hewlett
Skidmore, appearing pro se, addressed the court.  He explained to
Judge Fullam that he was an employee of PCTC and had a
disagreement with the railroad because it "did not live up to the
agreement in accord with the Interstate Commerce Act, Section
5(2)(f),"[5] a contract between PCTC "and the Brotherhood."
Skidmore told the court that it was his position that the court
had no authority under § 77(n) to limit his rights under that
agreement.  Judge Fullam interrupted Skidmore to say that he
agreed:  "I rather doubt that this proceeding affects any rights
under collective bargaining agreements; it can't.  There is no
question about that. ... This proceeding can't possibly have any
[effect] on your claims."  As discussed below, the report of the
trustees with respect to executory contracts was subsequently
incorporated into §§ 6.1 and 6.2 of Amended Plan of
Reorganization.

On March 17, 1978 (Order No. 3455), this court approved
an "Amended Plan of Reorganization" (the "Plan") that would
govern the liabilities of the debtor PCTC as it would be
reorganized at the conclusion of the § 77 proceeding.  The court
confirmed the Plan on August 17, 1978.  Order No. 3707.  See In
re Penn Cent. Transp. Co., 458 F. Supp. 1234 (E.D. Pa. 1978).

_____

5.  The transcript of the November 4, 1977 hearing quotes
Skidmore as referring to § "52(f)" of the Interstate Commerce
Act.  It is apparent Skidmore was referring to § 5(2)(f).

-10-

The Plan in § 1.31 provided for the formation of a "Reorganized Company," which the Plan defined as

> the corporation (the present Penn Central Transportation Company with appropriate changes to its articles of incorporation and bylaws) which has retained or is vested with all assets of the Debtor, including Valuation Case Proceeds, and which is the issuer of and obligor under the securities to be issued and assumed as provided by the Plan.

Section 3 of the Plan explained that it "continue[d] the existence of the debtor [PCTC]." The Plan also specified the assets that the Reorganized Company would hold, the classes of claims by PCTC creditors that the Reorganized Company would pay, and the securities that the Reorganized Company would issue to pay those claims. Certain creditors were allowed to recover interest that had accrued on their claims against PCTC during the reorganization, and some of the securities that the Reorganized Company issued to PCTC creditors also accrued interest. The Plan stated that claims not provided for in the Plan would be discharged.

Sections 6.1 and 6.2 of the Plan governed the liability of the Reorganized Company for the executory contracts of PCTC. Section 6.1 stated that the Reorganized Company would assume the contracts listed in an exhibit to the report of the trustees with respect to executory contracts, as discussed above. Section 6.2 explained that, subject to certain exceptions, all other executory contracts "are rejected as of the date of the filing of

the petition for reorganization by the Debtor."[6]  One exception
was that "[w]ith respect to executory contracts of the Debtor
heretofore assumed by Conrail ... pursuant to the RRR Act, such
rejection is deemed to be a rejection solely of the Debtor's and
the Trustees' remaining obligations and liabilities, if any,
under such contracts."

Section 7 of the Plan governed "Reservation of Claims."
It stated:

> Any Claim against the Debtor or the Trustees
> included in a class provided for in the Plan,
> which was not finally settled or adjudicated
> prior to the Consummation Date and which is
> thereafter settled, determined, or
> adjudicated to be valid, will participate
> under the Plan in the same manner as if it
> had been finally adjudicated or otherwise
> liquidated prior to the Consummation Date.
> The obligation of the Reorganized Company to
> such claimants will be limited to their
> participation under the Plan.  Such Claims
> against the Debtor or the Trustees will be
> defended, settled or compromised by the
> Reorganized Company as determined by its
> Board of Directors, subject to the continuing
> jurisdiction of the Court.  Obligations which
> result from any such actions and which are
> not treated in the Plan will be obligations
> of the Reorganized Company. ... The
> Reorganized Company will have the power and
> authority to employ, retain or replace
> attorneys and other experts to prosecute or
> defend any action or proceeding involving the
> Debtor or the Trustees.

On the same date that this court confirmed the Plan,
August 17, 1978, it issued a "Consummation Order and Final

---

6.  The Plan states that the document number of the report is
14,422.  This is an error.  The correct document number is
14,122.

Decree" (the "Consummation Order").  Order No. 3708.  The
Consummation Order decreed that PCTC would close its books at
11:59 p.m. on the "consummation date," October 24, 1978, and PCC,
the Reorganized Company, would open its books at 12:00 a.m. on
October 25, 1978.

Section 3.06 of the Consummation Order, "Discharge and
Release of Claims," provided:

> Subject to the provisions of Section 6.03
> below relating to the payment, assumption or
> satisfaction by the Reorganized Company of
> certain claims, the Debtors and the Trustees
> of the properties of the Debtors shall, as of
> the Consummation Date, be discharged and
> released forever from
>      (a) all obligations, debts, liabilities
> and claims against any of the Debtors,
> whether or not filed or presented, whether or
> not approved, acknowledged or allowed in
> these proceedings and whether or not provable
> in bankruptcy ....

The court addressed the "Ongoing Operation of the Reorganized
Company" in § 6 of the Consummation Order, and § 6.03
specifically discussed "Assumed Obligations."  That section
stated that claims would be satisfied as provided for in the
Plan.  The Consummation Order specifically required the
Reorganized Company "to continue the life and medical insurance
programs for non-agreement employees of the Debtor who retired
prior to April 1, 1976" and "to make the remaining payments due
to participants in the Contingent Compensation Plan of the Debtor
under the formula approved by the Court in Order No. 1087 ...."
Consummation Order §§ 6.03(i), (j).

Next, the Consummation Order required that PCC be substituted for the PCTC trustees in ongoing lawsuits.  Section 6.04 captioned "Pending Litigation," provided:

> The Reorganized Company ... shall be substituted at its own cost and expense as a party in lieu of the PCTC Trustees ... in any and all litigation ... to which the PCTC Trustees ... may be parties on the Consummation Date and <u>may</u> continue such litigation in the name of the Reorganized Company ....  (emphasis added).

Section VII of the Consummation Order addressed "Further Proceedings."  Section 7.02 of the Consummation Order enjoined certain claims against the Reorganized Company, including those "on account of or based upon any right, claim or interest ... against the Debtors ... except the obligations imposed on the Reorganized Company ... by the Plans and this Order or reserved for resolution or adjudication by this Order."  It read:

> All persons ... are hereby permanently restrained and enjoined from instituting, prosecuting or pursuing, or attempting to institute, prosecute or pursue, any suits or proceedings, at law or in equity or otherwise, against  the  Reorganized Company ... or [its] successors or assigns or against any of the assets or property of the Reorganized Company ... or [its] successors or assigns ... on account of or based upon any right, claim or interest of any kind or nature whatsoever which any such person ... may have in, to or against any of the Debtors, the Trustees of the Properties of the Debtors or any of their assets or properties, and from interfering with ... any portion of the property ... on or at any time after the Consummation Date in the possession of the Reorganized Company ... and from interfering with or taking steps to interfere with the Reorganized Company ... [its] officers and agents, or the operation of the

-14-

> properties or the conduct of the business of
> the Reorganized Company ... by reason of or
> on account of any obligation or obligations
> incurred by any of the Debtors or any of
> their Trustees in these proceedings, except
> the obligations imposed on the Reorganized
> Company ... by the Plans and this Order or
> reserved for resolution or adjudication by
> this Order.

Consummation Order § 7.02.

The Consummation Order provided in § 7.06 that this court's jurisdiction over the reorganization proceedings would terminate on the consummation date.  The court reserved jurisdiction, however, to deal with certain issues that may arise in the future.  Consummation Order, § 7.04.  Specifically, in § 7.04 the court reserved jurisdiction to address, among other things,

> [A]ny proof of claim against any of the
> Debtors or claim for administration expenses
> against any of the Debtors or Trustees,
> including without limitation [any] action to
> deny any such claims, to adjudicate the
> amount or validity thereof, to classify such
> claims, to provide for the satisfaction of
> such claims and to approve settlements of any
> such claims.

Consummation Order, § 7.04(c).  The court also reserved jurisdiction

> To consider and take appropriate action
> with respect to the matters referred to in
> Section 7.02 above, including action to
> enforce the injunctive provisions of that
> Section; [and]
> To take such further action and to enter
> such further orders as may be necessary to
> cure any defect, supply any omission,
> reconcile any inconsistency and put into
> effect and carry out this Order and the Plans
> and all other orders relative thereto entered

-15-

> by this Court and to prevent interferences therewith.

Consummation Order, § 7.04(h), (i).

The Claimants' lawsuits against PCTC in the Northern District of Ohio resulted in a Dickensian forty-year odyssey through the legal system began in the late 1906's.  On November 29, 1979, the Northern District of Ohio granted the motion of the Reorganized Company[7] to compel arbitration in the Knapik litigation pursuant to the 1964 MPA.[8]  The court ordered sua sponte that the Claimants' other three lawsuits against PCTC must be arbitrated as well.  It concluded that binding arbitration was required under the plain language of the MPA.[9] Knapik v. Penn Cent. Co., 69-722 (N.D. Ohio Nov. 29, 1979).  It also determined that arbitration was required even though the union to which Claimants belonged, not the Claimants themselves, was a party to the MPA.

On June 18, 1980, the "PENN CENTRAL CORPORATION [the Reorganized Company], successor to Penn Central Transportation

_____

7.  The brief filed in support of the motion to compel arbitration refers to the defendant as "Penn Central Company," the name plaintiffs gave to the defendant in their complaint.

8.  In 1976, the district court had presided over a jury trial in the Knapik suit, which resulted in a directed verdict for PCTC on claims other than those related to the Claimants' eligibility for benefits under the MPA.

9.  In his Memorandum Opinion and Order of November 29, 1979, Judge Lambros observed that these four cases had "been sifted and distilled until there now appears to be one paramount issue which is capable of resolution in a relatively quick and efficient manner."

Company and its Trustees," entered into an arbitration agreement with the Claimants.[10]  The arbitration agreement referred to the Claimants as "Employees," and to PCC, the Reorganized Company, as "Employer."  N.M. Berner signed the arbitration agreement as the "Carrier Member of the Committee" and did so "For the Employer: Penn Central Corporation."[11]

The arbitration agreement, referencing the 1964 MPA, explained the parties' rationale for arbitration:

> WHEREAS, disputes or controversies exist between Employees and Employer with respect to the interpretation, application, or enforcement of the provisions of certain Merger Protective Agreements of May 20, 1964, or of January 1, 1964, which disputes are the subjects of various actions pending in the United States District Court for the Northern District of Ohio, Eastern Division, at Nos. C69-722, C69-675, C69-947, and C74-914;
>
> WHEREAS, the parties hereto desire to follow as nearly as possible the provisions of Section 1(e) of said Merger Protective Agreement for the purpose of settling, concluding and resolving the said dispute or controversy, all according to the terms,

---

10.  At this stage of the Knapik lawsuit, all 17 plaintiffs remained in the case and each of them is a party to the arbitration agreement.

11.  Michael R. Kube signed the Agreement for Arbitration for the employees as the "Employee Member of the Committee."  The arbitration agreement provided for the formation of a committee that would consist of two members, one appointed by the employees and one by the employer, as well as a neutral member to be selected by agreement of the other two members or, in the event they could not agree, appointed by the National Mediation Board.

> conditions and provisions of this Agreement
> ....[12]

The arbitration agreement then set forth the procedures by which an arbitration panel would be selected.  Under the arbitration agreement, the arbitration panel would decide whether the Claimants were "entitled to the benefits of the Merger Protective Agreement of 1964," and if so, to render an award.[13]  According to the arbitration agreement, "Such awards shall be final and binding upon the parties hereto.  If in favor of the Employees, the award shall direct the Employer to comply therewith on or before a day named."

Much of what occurred thereafter is not relevant to the issues now before the court.  It suffices to say here that between 1980 and 2005, the Claimant's lawsuits involved two arbitrations.  The decision of the first arbitration panel was vacated by the district court.  The second arbitration panel held that none of the 17 Knapik plaintiffs was eligible for benefits

---

12.  As noted above, § 1(e) of the MPA provided for arbitration of disputes relating to the "interpretation or application of any provision" of the MPA.

13.  The arbitration agreement further provided that "[s]hould any disagreement exist with respect to the framing of the issues ... the opinion of the U.S. District Judge Thomas Lambros dated November 29, 1979 shall control."

under the MPA.[14]   The STB reversed that decision[15] with respect to the ten <u>Knapik</u> plaintiffs who are Claimants here.[16]   In 2005, the Northern District of Ohio once again ordered the parties to arbitrate the Claimants' eligibility for MPA benefits.   That arbitration proceeding began in mid-2006.[17]

In November 2007—over 29 years after PCC, the Reorganized Company, emerged from this reorganization proceeding

---

14.  On May 3, 1990, the first day of the second arbitration, counsel for the defendant introduced himself to the arbitration panel as "counsel for the carrier, Penn Central Corporation."

15.  Pursuant to the ICC Termination Act of 1995, Pub. L. 104-88, 109 Stat. 803 (1995), the STB is the successor to the ICC.  <u>See</u> <u>Augustus v. Surface Transp. Bd.</u>, 238 F.3d 419, 2000 U.S. App. LEXIS 33966, at *7 n.2 (6th Cir. Dec. 22, 2000).  The STB has jurisdiction to review arbitration decisions awarding or refusing to award benefits under collective bargaining agreements that embody employee protective agreements imposed by the STB or its predecessor the ICC.  49 C.F.R. § 1115.8; <u>Chi. & Nw. Transp. Co--Abandonment--Near Dubuque & Oelwein, IA</u>, 3 I.C.C. 2d 729, 735-36 (1987) ("<u>Lace Curtain</u>"), <u>aff'd sub nom.</u> <u>Int'l Bhd. Elec. Workers v. I.C.C.</u>, 274 U.S. App. D.C. 103, 862 F.2d 330 (D.C. Cir. 1988).  The STB reviews "issues of causation, the calculation of benefits, or the resolution of other factual questions" only for "egregious error."  <u>Lace Curtain</u>, 3 I.C.C. 2d at 735-36.

16.  As to the other seven <u>Knapik</u> plaintiffs, the STB affirmed the arbitration panel's finding that they were ineligible for MPA benefits.  The Court of Appeals for the Sixth Circuit affirmed this portion of the STB's order and an unsuccessful petition to the Supreme Court for certiorari followed.  <u>Augustus v. Surface Transp. Bd.</u>, 238 F.3d 419, 2000 U.S. App. LEXIS 33966, at *7 n.2 (6th Cir. Dec. 22, 2000), <u>cert. denied</u> 533 U.S. 949 (2001).  These seven <u>Knapik</u> plaintiffs are not Claimants here.

17.  Initially, each of the four lawsuits was to be arbitrated separately.  In March 2007, however, the Northern District of Ohio ordered the actions to be arbitrated in one consolidated proceeding.

and 27 years after it entered into the arbitration agreement
concerning the MPA claims—the Reorganized Company filed an
emergency petition asking this court to halt the arbitration
ordered by the Northern District of Ohio.  Doc. No. 18,719.  The
Reorganized Company argued for the first time that the Claimants
were attempting to collect MPA benefits, attorneys' fees, and
prejudgment interest from the Reorganized Company instead of from
PCTC, in purported violation of the two court-approved
stipulations dated March 20, 1973 and February 21, 1975 that
permitted Claimants to litigate their claims against PCTC "to a
conclusion."  See Doc. Nos. 5383, 8600.  This court denied the
emergency petition and reiterated that "[a]ny judgment which may
result from [the Claimants' lawsuits] may be enforced only if
specifically hereafter authorized by this Court."  In re Penn
Cent. Transp. Co., No. 70-347 (E.D. Pa. Nov. 27, 2007) (Doc. No.
18,720, Order No. 4349).

        Then, in December 2007, only days before the
arbitration hearing was set to begin, the Reorganized Company,
returning again to this court, sought an order enjoining
Claimants from seeking to recover in the arbitration an award
that included attorneys' fees or prejudgment interest.  Doc. No.
18,721.  The court denied this petition as well.  In re Penn
Cent. Transp. Co., No. 70-347 (E.D. Pa. Jan. 9, 2008) (Doc. No.
18,724, Order No. 4350).  Judge Fullam permitted the Claimants to
submit to the arbitrators "all issues affecting the merits of the
claims asserted."  Id.

-20-

The Reorganized Company argued to the three-person arbitration panel that PCTC alone is liable for any MPA benefits due to the Claimants. The majority of the arbitrators found, however, that the Reorganized Company was estopped from denying it was a proper party to the arbitration based on its extensive participation in the litigation giving rise to the arbitration and in the arbitration itself.

On July 20, 2009, the Claimants obtained a $13,453,504 arbitration award. The arbitration panel majority entered its award against both PCTC and the Reorganized Company. The award consisted of $564,820 in MPA benefits and $12,888,684 of pre-judgment interest calculated through December 31, 2007.

The Claimants moved to confirm the arbitration award in the Northern District of Ohio. On August 12, 2009, the Reorganized Company filed its third emergency petition in this court seeking an order enjoining Claimants from prosecuting their motion to confirm the arbitration award. Doc. No. 18,727. The court denied that petition the next day. It once again ruled that at the conclusion of litigation in the Northern District of Ohio, it would "resolve, if necessary, (1) whether liability may be imposed upon the reorganized company (American Premier Underwriters, Inc.), and (2) whether this Court's Consummation Order precludes an award of pre-judgment interest." In re Penn Cent. Transp. Co., No. 70-347 (E.D. Pa. Aug. 13, 2009) (Doc. No. 18,733, Order No. 4351).

In September 2009, the Reorganized Company for the fourth time petitioned this court to assert jurisdiction and order that the Reorganized Company could not be held liable for the arbitration award.  Doc. No. 18,737.  Judge Fullam reaffirmed that he would address that issue only at the conclusion of the litigation in the Northern District of Ohio.  In re Penn Cent. Transp. Co., No. 70-347 (E.D. Pa. Oct. 6, 2009) (Doc. No. 18,739, Order No. 4352).

Subsequently, the Reorganized Company appealed the arbitration panel's award to the STB.  The award was affirmed with slight modifications on January 6, 2011.  The Reorganized Company did not appeal the STB's decision to the Court of Appeals for the Sixth Circuit and did not oppose confirmation of the modified arbitration award by the United States District Court for the Northern District of Ohio.  Thereafter, that district court entered judgment for each Claimant or his or her personal representative with prejudgment interest calculated through March 31, 2011.  Unfortunately, only 5 of the 32 Claimants were still alive at that time.  The judgment is broken down as follows:

| Name of Claimant or Estate | MPA Benefit | Prejudgment Interest | Total |
|---|---|---|---|
| Estate of Jack Acre | 10,556 | 334,855 | 345,411 |
| Estate of Edward Benko | 123,110 | 2,648,437 | 2,771,547 |
| Estate of Ken Day | 48,267 | 1,233,957 | 1,282,224 |
| Estate of Harvey Doran | 12,210 | 362,701 | 374,911 |
| Estate of Joseph Gastony | 16,632 | 437,305 | 453,937 |

| | | | |
|---|---:|---:|---:|
| Estate of George Gentile | 7,562 | 232,988 | 240,550 |
| Estate of George Norris | 50,156 | 1,292,696 | 1,342,852 |
| Estate of Christ Steimle | 3,540 | 107,642 | 111,182 |
| Estate of Clarence Tomczak | 52,667 | 1,307,978 | 1,360,645 |
| Estate of Frank Uher | 23,560 | 698,467 | 722,027 |
| Estate of William Bilinsky | 2,293 | 55,706 | 57,999 |
| Estate of Joseph Crtalic | 2,959 | 69,974 | 72,933 |
| Estate of Paul Foecking | 13,767 | 207,721 | 221,488 |
| John F. Gallagher | 3,053 | 91,999 | 95,052 |
| Estate of Gus Janke | 4,146 | 109,345 | 113,491 |
| Estate of Joseph Jarabeck | 3,557 | 40,272 | 43,829 |
| Estate of E.W. Kochenderfer | 6,784 | 164,544 | 171,328 |
| Estate of Patrick McLaughlin | 34,433 | 874,132 | 908,565 |
| Estate of Robert McNeely | 5,146 | 113,618 | 118,764 |
| Andrew Novotny | 2,195 | 54,086 | 56,281 |
| Estate of Martin Opalk | 9,469 | 241,867 | 251,336 |
| Estate of L.S. Pentz | 5,397 | 125,340 | 130,737 |
| Estate of Robert Schreiner | 20,815 | 541,796 | 562,611 |
| Estate of Paul Scuba | 12,892 | 323,751 | 336,643 |
| Estate of George Sophner | 16,738 | 451,883 | 468,621 |
| Estate of Peter Sowinski | 9,100 | 219,814 | 228,914 |
| Phillip Franz | 10,473 | 305,248 | 315,721 |
| Thomas O'Neil | 10,406 | 301,275 | 311,681 |
| Estate of Robert Watjen | 10,950 | 317,012 | 327,962 |
| Estate of Ana Mae Wilger | 10,435 | 310,285 | 320,720 |
| Estate of David Bundy | 10,793 | 312,460 | 323,253 |
| Estate of James Feldscher | 10,759 | 307,264 | 318,023 |
| Total: | 564,820 | 14,196,418 | 14,761,238 |

That judgment is the final judgment in all four of the lawsuits initiated by the Claimants.

The Reorganized Company then petitioned this court to exercise its retained jurisdiction to determine whether the Reorganized Company is liable to Claimants under the judgment on the docket of the Northern District of Ohio.  Doc. No. 18,740. In an order dated March 29, 2011, this court "invoke[d] its exclusive jurisdiction to decide to what extent, if any, the ... Arbitration Award reduced to Judgment in the United States District Court for the Northern District of Ohio may be enforced."  In its order, the court wrote that it would consider the following three issues:

> a. Whether liability may be imposed upon the reorganized company (American Premier Underwriters, Inc.) in connection with the above-mentioned Arbitration Award reduced to Judgment in the United States District Court, Northern District of Ohio;
>
> b. Whether this Court's Consummation Order, and applicable bankruptcy law, precludes an award of pre-judgment interest against Debtor, Penn Central Transportation Company, in connection with the above-mentioned Arbitration Award reduced to Judgment in the United States District Court, Northern District of Ohio;
>
> c. Whether the above-mentioned Arbitration Award reduced to Judgment in the United States District Court, Northern District of Ohio, may be enforced against the Debtor, Penn Central Transportation Company.

In re Penn Cent. Transp. Co., No. 70-347 (E.D. Pa. Mar. 29, 2011) (Doc. No. 18,745, Order No. 4353).  Following a short discovery period allowed by this court, the Reorganized Company moved for

-24-

summary judgment.  In response, the Claimants filed a motion
under Rule 56(d) of the Federal Rules of Civil Procedure seeking
additional discovery.  The court denied that motion, and
Claimants thereupon filed an omnibus cross-motion for summary
judgment and opposition to the motion of the Reorganized Company
for summary judgment.  See In re Penn Cent. Transp. Co., No. 70-
347, U.S. Dist. LEXIS 140342, at *9-*13 (E.D. Pa. Dec. 6, 2011).

These motions are currently before the court.

III.

In its motion for summary judgment the Reorganized
Company argues that the Plan and the Consummation Order bar any
liability against it for an award of benefits under the MPA.  It
maintains that the Claimants may look only to PCTC to satisfy
that judgment notwithstanding that, in its view, PCTC "ceased to
exist on the consummation date."  Reorganized Company's Reply Br.
at 28.  It also argues that the Bankruptcy Act of 1898 and the
Plan forbid post-petition interest, so that at most it could be
held responsible for only the principal due to Claimants.

Claimants counter in their cross-motion that the
Bankruptcy Act of 1898, and § 77(n) in particular, prevents this
court from modifying the arbitration award.  Claimants further
argue that judicial estoppel prevents the Reorganized Company
from denying that it is liable for the arbitration award in light
of its conduct for almost 30 years during the litigation of the
claims at issue.  Claimants ask the court to confirm against the
Reorganized Company the full amount of the judgment, including

-25-

prejudgment interest, entered in their favor by the Northern District of Ohio.

This court retains jurisdiction to enforce the Plan and orders, including the Consummation Order, arising out of the reorganization of the PCTC.  Under § 77(a) of the Bankruptcy Act of 1898, Congress authorized federal courts to exercise broad powers in railroad reorganization proceedings.  Section 77(a) provides that federal courts presiding over such proceedings

> shall, during the pendency of the proceedings
> under this section and for the purposes
> thereof, have exclusive jurisdiction of the
> debtor and its property wherever located, and
> shall have and may exercise in addition to
> the powers conferred by this section all the
> powers, not inconsistent with this section,
> which a Federal court would have had if it
> had appointed a receiver in equity of the
> property of the debtor for any purpose.

11 U.S.C. § 205(a) (1970) (repealed 1978).  This "exclusive jurisdiction" was an essential component of § 77 reorganization proceedings.  See Nat'l R.R. Passenger Corp. v. Blanchette, 551 F.2d 127, 134 (7th Cir. 1977).  Congress also contemplated that the jurisdiction of the reorganization court would extend beyond the final decree.  Section 77(f) of the Bankruptcy Act of 1898 states:

> Upon confirmation of the plan, the debtor and
> any other corporation or corporations
> organized or to be organized for the purpose
> of carrying out the plan, shall have full
> power and authority to, and shall put into
> effect and carry out the plan and the orders
> of the judge relative thereto, **under and
> subject to the supervision and the control of
> the judge**, the laws of any State or the

-26-

> decision or order of any State authority to
> the contrary notwithstanding.

11 U.S.C. § 205(f) (1970) (repealed 1978) (emphasis supplied).

In § 7.04(i) of the August 17, 1978 Consummation Order, the court reserved jurisdiction

> To take such further action and to enter such
> further orders as may be necessary to cure
> any defect, supply any omission, reconcile
> any inconsistency and put into effect and
> carry out this Order and the Plans and all
> other orders relative thereto entered by this
> Court and to prevent interferences therewith.

Consummation Order, § 7.04(i).  Moreover, in the stipulations that permitted the Claimants' lawsuits to continue in the Northern District of Ohio, the court specifically stated that "no judgment which may hereinafter be entered in said civil action shall be enforced except as hereinafter authorized by this Court."  Doc. Nos. 5383, 8600.

The exclusive jurisdictional provisions of § 77 of the Bankruptcy Act of 1898 and the explicit reservations of jurisdiction in this court's orders leave no doubt that this court possesses the jurisdiction to determine whether and to what extent the Reorganized Company may be held liable for the judgment entered in the Northern District of Ohio in light of relevant bankruptcy law, the Plan, and the orders, including the Consummation Order, entered in this proceeding.

IV.

We consider first whether the Reorganized Company may be required to pay a judgment awarding former PCTC employees

-27-

merger protection benefits under the MPA, a pre-petition collective bargaining agreement signed in 1964 by the Pennsylvania Railroad Company, the New York Central Railroad Company, and the Brotherhood of Railroad Trainmen.

The MPA provided that "none of the present employes [sic] of either of the said Carriers shall be deprived of employment or placed in a worse position with respect to compensation, rules, working conditions, fringe benefits or rights and privileges pertaining thereto at any time" during employment with PCTC.  Appendix E of the MPA calculated the benefit to which employees were entitled by comparing the employee's average monthly earnings for the year preceding May 16, 1964 to the employee's wages during the month for which the employee claimed MPA benefits.

Collective bargaining agreements involving railroad workers have long been afforded enhanced protection in bankruptcy.  See NLRB v. Bildisco & Bildisco, 465 U.S. 513, 521-23 & n.8 (1984); Baker v. Gold Seal Liquors, Inc., 417 U.S. 467, 473 (1974).  The Bankruptcy Act of 1898 prohibits the reorganization court in a § 77 proceeding from modifying the obligations of railroads with respect to the wages and working conditions of their employees.  11 U.S.C. § 205(n) (repealed 1978).  The second sentence of § 77(n) reads:  "No judge or trustee acting under this title shall change the wages or working conditions of railroad employees except in the manner prescribed in the Railway Labor Act, as amended June 21, 1934, or as it may

-28-

be hereafter amended."  In enacting the modern Bankruptcy Code in 1978, Congress preserved in 11 U.S.C. § 1167 the rule set forth in the second sentence of § 77(n).  In a report, the House Judiciary Committee commented, "The subject of railway labor is too delicate and has too long a history for this code to upset established relationships.  The balance has been struck over the years.  This provision continues that balance unchanged."  H. REP. NO. 95-595 at 423 (1978), reprinted in 1978 U.S.C.C.A.N. 5963, 6379.[18]

Although neither the parties nor the court has found any case specifically applying § 77(n) to merger protection benefits, such benefits are undeniably within the scope of that statutory provision.  The MPA ensured that employees' wages would not fall below a particular level as a result of the merger between the Pennsylvania Railroad Company and the New York Central Railroad Company.  Indeed, the judgment at issue reflects the arbitration panel's assessment of the diminution in wages the Claimants experienced as a result of the merger.  Additionally, courts interpreting the phrase "rates of pay, rules, and working conditions" in the context of the Railway Labor Act, 45 U.S.C.

---

18.  In 1984 Congress enacted 11 U.S.C. § 1113, which provided a mechanism by which a trustee or debtor in possession could invalidate a collective bargaining agreement other than one pertaining to railroad workers.  This overruled a portion of the Supreme Court's opinion in Bildisco & Bildisco.  See Mason v. Official Comm. of Unsecured Creditors (In re FBI Distrib. Corp.), 330 F.3d 36, 44 (1st Cir. 2003).  Section 1113 explicitly does not apply, however, to collective bargaining agreements subject to the Railway Labor Act.  11 U.S.C. § 1113(a).

§ 152, have found within its scope matters related to "seniority, severance pay, and other matters relating to employment security."  Int'l Ass'n of Machinists & Aerospace Workers v. Ne. Airlines, Inc., 473 F.2d 549, 557 (1st Cir. 1972); see also Nat'l Labor Relations Bd. v. Frontier Homes Corp., 371 F.2d 974, 979 (8th Cir. 1967).[19]

We note also that in his colloquy with Hewlett Skidmore during the 1977 hearing with respect to the executory contracts the trustees for PCTC proposed to reject, Judge Fullam recognized that these proceedings could not affect workers' rights under the MPA.  As explained above, in their report regarding executory contracts, the trustees listed in Exhibit I those executory contracts the trustees desired to affirm.  At the time the report was filed in 1977, it was anticipated that all executory contracts not so listed would be disaffirmed in the Plan.  Judge Fullam assured Skidmore that his rights under the MPA would be unaffected even though the PCTC trustees did not list the MPA among the contracts they desired to affirm in Exhibit I of their report.[20]

---

19.  In interpreting the meaning of words in § 77(n), this court has previously looked for guidance to "similar federal laws." For example, the court looked to the Federal Employers Liability Act for assistance in defining the word "employee" as that phrase is used in the first sentence of § 77(n), which pertains to claims filed by railroad employees who are injured or killed on the job.  In re Penn Cent. Transp. Co., 419 F. Supp. 1370, 1371-72 (E.D. Pa. 1976).

20.  When the trustees submitted their report concerning executory contracts, the ICC had already ruled that employees of
(continued...)

It is undisputed that during this reorganization proceeding PCTC's obligations under the MPA were not modified pursuant to the Railway Labor Act.  There is also no question that PCTC employees were paid wages and other employees received MPA benefits during the course of this proceeding.  At the time its reorganization petition was filed, PCTC had 92,000 employees. In re Penn Cent. Transp. Co., 354 F. Supp. 408, 412 (E.D. Pa. 1973).  As a result of the special status of railroad collective bargaining agreements under § 77(n) of the Bankruptcy Act of 1898 and the inability of the court to modify them, it is not surprising that neither the Plan nor the Consummation Order made any specific reference to the MPA.

The Reorganized Company does not contest that the Claimants are entitled to merger protection benefits under the MPA.  It argues instead that the obligation to pay such benefits belonged to PCTC, which in its view, ceased to exist on the consummation date, October 24, 1978.  The Reorganized Company maintains that it is a separate entity from PCTC, that it is not a "carrier," and that post-consummation it litigated for over 30 years with Claimants merely as the representative of the non-existent PCTC and not as an interested party to which any liability could attach.

_____

20.(...continued)
PCTC subsidiaries, including CUTC, were entitled to recover benefits under the MPA.  See Pa. R.R. Co.-Merger-N.Y. Cent. R.R. Co., 347 I.C.C. 536 (1974).

-31-

This argument misses the mark.  The Supreme Court has explained that the purpose of a reorganization under § 77 of the Bankruptcy Act of 1898 is not to terminate the existence of the debtor railroad through liquidation but instead "the aim is by financial restructuring to put back into operation a going concern." Gold Seal Liquors, 417 U.S. at 470.  Indeed, "a proceeding under § 77 ... is not an ordinary proceeding in bankruptcy.  It is a special proceeding which seeks only to bring about a reorganization, if a satisfactory plan to that end can be devised." Id. at 470 n.3 (quoting Cont'l Ill. Nat'l Bank & Trust Co. v. Chi., Rock Island & Pac. Ry. Co., 294 U.S. 648, 676 (1935)).  In this case, an Amended Plan of Reorganization was devised and the court approved that plan.  Section § 1.31 of the Plan is consistent with the purpose of § 77 and defines the Reorganized Company as

> the corporation (the present Penn Central Transportation Company with appropriate changes to its articles of incorporation and bylaws) which has retained or is vested with all assets of the Debtor, including Valuation Case Proceeds, and which is the issuer of and obligor under the securities to be issued and assumed as provided by the Plan.  (Emphasis added).

Section 3 explains that the Reorganized Company was formed by "continu[ing] the existence of the Debtor," reposing in it certain assets, and conferring upon it certain liabilities. Significantly, at the time the Plan was consummated, the "Amended and Restated Articles of Incorporation of the Penn Central Corporation" provided:  "The corporation heretofore known as Penn

-32-

Central Transportation Company shall be hereafter known as The Penn Central Corporation ... and <u>shall continue its corporate existence</u> as a business corporation organized and incorporated under the laws of the Commonwealth of Pennsylvania."[21]  (Emphasis added).

Accordingly, the Reorganized Company is not a new entity, and PCTC has not disappeared in liquidation or otherwise. PCTC has simply undergone a financial restructuring.  <u>Gold Seal Liquors</u>, 417 U.S. at 470 & n.3.  The Reorganized Company is, in fact, the very same corporation that the Claimants had sued——only reorganized with a new name!  While the Reorganized Company described itself in the 1980 arbitration agreement as the "successor" to PCTC, it could not have meant it was a new or separate corporation from PCTC in light of § 77 of the Bankruptcy Act of 1898 as well as the language of the Plan and the Reorganized Company's Amended and Restated Articles of Incorporation.  Neither the Plan, nor the articles of incorporation, nor the Consummation Order refers to PCC as the successor to PCTC.  When the Reorganized Company entered into the arbitration agreement in 1980 and when it litigated in the Northern District of Ohio for over 30 years, it was doing so simply as the reorganized PCTC, not as a corporation separate and

---

21.  These Amended and Restated Articles of Incorporation took effect on October 6, 1978.  As noted above, in 1994, the Reorganized Company changed its name from PCC to American Premier Underwriters, Inc.

apart from PCTC.  Contrary to the position of the Reorganized
Company, PCTC did not "cease to exist" on October 24, 1978.

The discharge and injunction provisions of the Plan and
Consummation Order entered in this proceeding did not relieve the
Reorganized Company of the obligation to pay MPA benefits to
Claimants.  As stated previously, § 3.06 of the Consummation
Order discharged the Reorganized Company from liability on any
debt of PCTC that was not provided for in the Plan.  Section 7.02
of the Consummation Order enjoined claims against the Reorganized
Company "on account of or based upon any right, claim or interest
... against the Debtors ... except the obligations imposed on the
Reorganized Company ... by the Plans and this Order or reserved
for resolution or adjudication by this Order."  Nonetheless,
pursuant to the second sentence of § 77(n), the court lacked any
authority to modify the wages or working conditions of PCTC
employees.  Thus, the injunction under § 7.02 of the Consummation
Order and the discharge provision in § 3.06 of that order did not
reach or affect the MPA.  The Reorganized Company clearly
recognized that the injunction and discharge provisions afforded
it no protection with respect to the MPA for otherwise it would
never have thereafter entered into the arbitration agreement in
1980 and continued to litigate the matter for so many years.

V.

Even if the Reorganized Company were correct that
somehow it was not liable for payment of MPA benefits to PCTC's
former employees as a result of the Plan and Consummation Order,

-34-

we find that the Reorganized Company is estopped from denying its liability to Claimants based on its conduct and repeated representations to Claimants in the Northern District of Ohio litigation and the resultant arbitration.

In September 1979, nearly a year after the consummation date, the "Penn Central Company" filed with that court a motion to compel arbitration in accordance with § 1(e) of the MPA.  The Northern District of Ohio granted the motion in November of that year.  In June 1980, Claimants entered into an "Agreement for Arbitration" with "PENN CENTRAL CORPORATION, successor to Penn Central Transportation Company and its Trustees, a Pennsylvania corporation (hereinafter called the 'Employer')."  The Agreement for Arbitration called for a panel of arbiters to convene to consider whether Claimants were entitled to benefits under the MPA.  It stated that any award made by the panel "shall be final and binding upon the parties hereto.  If in favor of the Employees," that is the Claimants, "the award shall direct the Employer to comply therewith on or before a day named."  Contrary to its present argument, Penn Central Corporation considered itself the employer and a "carrier" in the arbitration agreement. N.M. Berner signed it "For the Employer:  Penn Central Corporation" and as "Carrier Member of [the arbitration] Committee."

Furthermore, at one arbitration hearing held pursuant to that agreement in May 1990, counsel for the "Employer" introduced himself as "counsel for the carrier, Penn Central

-35-

Corporation."  In discovery exchanged during the arbitration
proceedings, the defendant also referred to itself as the "Penn
Central Corporation."  In an April 17, 2001 letter, the "Penn
Central Corporation" explained to Claimants' counsel that the
significant delays in the litigation had been to its detriment.
None of these documents mentions PCTC or that PCC was acting
simply on PCTC's behalf.[22]

        There is no evidence that prior to 2007 the Reorganized
Company raised its current position that it was litigating
against Claimants in some representative capacity.  Certainly the
motion to compel arbitration and the 1980 arbitration agreement,
events occurring over 25 years prior to 2007, said nothing about
it.  Nor is there any indication that, prior to 2007, the
Reorganized Company asserted that Claimants could recover MPA
benefits only from a defunct PCTC and not from the Reorganized
Company.

        Rather, the Reorganized Company's conduct for decades
establishes that it considered itself a party with a direct
interest in the outcome of the litigation with Claimants.  If the
Plan or the Consummation Order truly did relieve the Reorganized
Company from any liability for the MPA benefits at issue in that
litigation or if some other provision substituted the Reorganized

_____

22.  The transcript of the May 1990 arbitration proceeding and
the discovery responses, as submitted by Claimants, are
incomplete documents.  The Reorganized Company has not suggested
that other portions of these documents are relevant to the issues
now before the court.

Company into litigation merely as PCTC's representative, the court simply cannot imagine why the Reorganized Company would have waited over 25 years to assert such a defense.  It makes absolutely no sense to have litigated vigorously for so long and spend so much in the way of counsel fees on behalf of a company, that is PCTC, which, in the Reorganized Company's view, had ceased to exist and had no assets.

Such conduct only makes sense if the Reorganized Company believed it was liable for the outcome of that litigation.  This undermines the Reorganized Company's argument that it was required by § 6.04 of the Consummation Order to participate in the litigation with Claimants as the representative of PCTC.  As stated above, § 6.04 of the Consummation Order provided that the Reorganized Company "shall be substituted at is own cost and expense as a party in lieu of the PCTC Trustees ... in any and all litigation ... to which the PCTC Trustees ... may be parties on the Consummation Date and may continue such litigation in the name of the Reorganized Company ...."  Nothing in this section created the kind of representational capacity the Reorganized Company now claims to have had.  Moreover, the permissive phrase "may continue the litigation" in § 6.04 did not obligate the Reorganized Company to continue the litigation or to execute an arbitration agreement, particularly if the PCTC was out of business and had no funds with which to pay any judgment.

-37-

The doctrine of judicial estoppel prevents parties from abusing the judicial process by "playing 'fast and loose with the courts'" and claiming relief in successive court actions through the use of inconsistent litigating positions.  <u>Scarano v. Cent. R.R. Co. of N.J.</u>, 203 F.2d 510, 513 (3d Cir. 1953); <u>see also</u> <u>Maine v. New Hampshire</u>, 532 U.S. 742, 750 (2001) (citing <u>Scarano</u>).  Judicial estoppel is appropriate when the following three factors are present:

> (1) the party to be estopped is asserting a position that is irreconcilably inconsistent with one he or she asserted in a prior proceeding; (2) the party changed his or her position in bad faith, i.e., in a culpable manner threatening to the court's authority or integrity; and (3) the use of judicial estoppel is tailored to address the affront to the court's authority or integrity.

<u>Dam Things from Den. v. Russ Berrie & Co.</u>, 290 F.3d 548, 559 (3d Cir. 2002).

The decision of the Court of Appeals in <u>Air Line Pilots Ass'n v. Continental Airlines (In re Continental Airlines)</u>, 125 F.3d 120 (3d Cir. 1997), is squarely on point.  There, the Court of Appeals rejected the effort of Continental, in a bankruptcy proceeding, belatedly to reject arbitration of a labor dispute when "[t]hroughout this litigation, Continental has premised its arguments on the assumption that it is bound by the LPPs [Labor Protective Provisions] and has a duty to arbitrate the LPP dispute."  The Court held that Continental was barred by judicial estoppel from repudiating its earlier position.  <u>Id.</u> at 138.

-38-

Similarly, on the facts before us, judicial estoppel is the only appropriate remedy.  The position the Reorganized Company first asserted in 2007 is irreconcilably inconsistent with its position through the preceding 25 years of litigation. In 1980, the Reorganized Company signed an arbitration agreement explicitly stating that any award rendered by the arbitration panel "shall be final and binding upon the parties hereto."  In other documents, the Reorganized Company represented itself as a party to the litigation with Claimants.  Only in 2007, did the Reorganized Company assert its current position.  The Reorganized Company has not proffered any reasonable explanation for the decades-long delay that preceded its about-face.  Under the circumstances, its change of position will work an unfair advantage against the Claimants amounting to a lack of good faith.  Finally, allowing Claimants to recover their judgment from the Reorganized Company is the only remedy that is appropriate in this circumstance in light of the representations that were made.  Dam Things from Den., 290 F.3d at 559.

Pursuant to § 77(n) of the Bankruptcy Act of 1898, 11 U.S.C. § 205(n) (repealed 1978), the obligation of PCTC to pay Claimants benefits due under the MPA was not modified or discharged in this reorganization proceeding and so became an obligation of the Reorganized Company.  We reiterate that the Reorganized Company is the reorganized PCTC with a new name, and not a separate successor entity.  However, even if the liability of PCTC to make such payments were somehow discharged and did not

pass through to the Reorganized Company, the Reorganized Company
is estopped from denying its liability to Claimants in light of
its conduct during nearly 30 years of hard-fought litigation.

VI.

Finally, we turn to whether the Reorganized Company may be required to pay the portion of the judgment entered by the Northern District of Ohio awarding Claimants post-petition, prejudgment interest.  As previously noted, $14,196,418 of the $14,761,238 judgment consists of prejudgment interest.  The Reorganized Company maintains that under the Bankruptcy Act of 1898 and the Plan, it is not liable to pay prejudgment interest to Claimants.

We acknowledge that as a general matter courts did not require payment of post-petition interest to creditors under the Bankruptcy Act of 1898.  See, e.g., Nicholas v. United States, 384 U.S. 678 (1966); New York v. Saper, 336 U.S. 328 (1949); Vanston Bondholders Protective Comm. v. Green, 329 U.S. 156 (1946); Sexton v. Dreyfus, 219 U.S. 339 (1911).  The Supreme Court explained the rationale for this rule as follows:

> [I]t is true ... that as a general rule, after property of an insolvent is in custodia legis interest thereafter accruing is not allowed on debts payable out of the fund realized by a sale of the property.  But that is not because the claims had lost their interest-bearing quality during that period, but is a necessary and enforced rule of distribution, due to the fact that in case of receiverships the assets are generally insufficient to pay debts in full.  If all claims were of equal dignity and all bore the same rate of interest, from the date of the receivership to the date of final distribution, it would be immaterial whether the dividend was calculated on the basis of the principal alone or of principal and interest combined.  But some of the debts might carry a high rate and some a low rate,

-41-

> and hence inequality would result in the
> payment of interest which accrued during the
> delay incident to collecting and distributing
> the funds.  As this delay was the act of the
> law, no one should thereby gain an advantage
> or suffer a loss.  For that and like reasons,
> in case funds are not sufficient to pay
> claims of equal dignity, the distribution is
> made only on the basis of the principal of
> the debt.

Am. Iron & Steel Mfg. Co. v. Seaboard Air Line Ry., 233 U.S. 261,

266 (1914).  The Supreme Court has held, however, that

disallowance of post-petition interest is "a rule of liquidation

practice" based on "practical considerations" and not a matter of

"substantive law."  Bruning v. United States, 376 U.S. 358, 363

(1964).  In American Iron & Steel, the Court noted that the

general rule against post-petition interest

> did not prevent the running of interest
> during the Receivership; and if as a result
> of good fortune or good management, the
> estate proved sufficient to discharge the
> claims in full, interest as well as principal
> should be paid.  Even in bankruptcy, and in
> the face of the argument that the debtor's
> liability on the debt and its incidents
> terminated at the date of adjudication and as
> a fixed liability was transferred to the
> fund, it has been held, in the rare instances
> where the assets ultimately proved sufficient
> for the purpose, that creditors were entitled
> to interest accruing after adjudication.

Am. Iron & Steel Mfg. Co., 233 U.S. at 266-67.  As far as we

know, the Supreme Court has never cited any provision of § 77 of

the Bankruptcy Act of 1898 as prohibiting the payment of post-

petition interest.

-42-

The Supreme Court has clarified the circumstances in which post-petition interest was available under the Bankruptcy Act of 1898.  In Bruning, a formerly bankrupt taxpayer owed the United States pre-petition taxes and interest that were not dischargeable in bankruptcy.  The government retained a post-bankruptcy income tax refund and applied it to the pre-petition tax debt and the interest thereon.  Bruning sued for a refund of the interest that had accumulated on the tax debt since the filing of his bankruptcy petition.  The Supreme Court held that the United States was entitled to collect the post-petition interest on Bruning's non-dischargeable, pre-petition tax debt. It explained that payment of post-petition interest in such circumstances "cannot inconvenience administration of the bankruptcy estate, cannot delay payment from the estate unduly, and cannot diminish the estate in favor of high interest creditors at the expense of other creditors."  Id. at 363; see id. at n.4.

The court finds that the factors that the Supreme Court discussed in Bruning favor allowing the Claimants to collect the post-petition, prejudgment interest awarded to them.  The reorganization in this case was consummated 34 years ago, in 1978.  There is simply no basis to conclude that allowing Claimants to collect post-petition interest now will "inconvenience administration of the bankruptcy estate," "delay payment from the estate unduly," or "diminish the estate in favor

-43-

of high interest creditors at the expense of other creditors."
Bruning, 376 U.S. at 363.

        The Reorganized Company suggested at oral argument that
allowing Claimants to collect post-petition, prejudgment interest
is unfair to other claimants whose rights to such interest was
terminated by this reorganization proceeding.  This argument is
unavailing for three reasons.  First, other PCTC employees who
were entitled to MPA benefits were paid on an ongoing basis
during the bankruptcy.  Second, the Reorganized Company has not
pointed to any other PCTC creditor that held a non-dischargeable
claim and that did not receive post-petition interest.

        Third, in accordance with the Plan, many PCTC
creditors, including unsecured creditors, received post-petition
interest.  The Class E and Class I claims listed in Exhibit 2 of
the Plan, which included state, local, property, and corporate
taxes, included estimated interest through December 31, 1977.
Even general unsecured creditors with pre-bankruptcy claims of
Class M were provided interest on claims arising from "a
contractual agreement calling for payment of interest or its
functional equivalent as an express or an implied term."  Exhibit
4 to the Plan estimated the amount of such interest at $136.9
million.[23]  In light of the vast sums of interest paid to PCTC

_____

23.  Pursuant to §§ 4 and 5 of the Plan, claims of Classes E and
I were paid in cash and with notes, some of which provided for
the accrual of interest.  Class M claims were paid with stock in
the Reorganized Company and "certificates of beneficial
interest," which were payable out of the proceeds of the
                                              (continued...)

-44-

creditors, including interest paid to unsecured creditors with an implied contractual right to interest, we see no unfairness to other creditors at this late date.

The Reorganized Company further argues that prejudgment interest is not available to the Claimants because the judgment in their favor is payable under the Plan only as a Class D claim. We disagree.

According to § 2.1 of the Plan, Class D claims consisted of "Section 211(h) Claims, as set forth in Exhibit 1, and any other claims of the United States found by the Court to be entitled to be treated as Administration Claims." As noted above, § 211(h) created a mechanism by which the PCTC Trustees paid certain operating expenses, including labor expenses, with borrowed government funds. In return, the government obtained high priority claims against the bankruptcy estate, which the Reorganized Company was obligated to repay. The Plan provided in § 5.4 that the government's Class D claims would "be paid by issuance and delivery of Series B Notes equal in principal amount to the Claims at the dates of issue."[24] The Reorganized Company argues that Claimants cannot recover prejudgment interest because it paid only the principal amount of Class D claims with Series B Notes under the Plan.

---

23.(...continued)
Valuation Case.

24.  The Plan did provide that interest would accrue on the
Series B Notes from the date of issue.

This argument fails because the judgment in favor of Claimants is clearly not a Class D claim within the meaning of the Plan.  The Claimants' judgment did not arise from money loaned to PCTC or its trustees by Conrail or an agency of the United States pursuant to § 211(h).  Rather, the judgment in favor of Claimants represents money that the Reorganized Company failed to pay over to Claimants many decades ago.  Accordingly, it is of no consequence that the Reorganized Company did not pay interest on Class D claims.

In our view, under the circumstances before us, it would be inequitable for the Reorganized Company not to pay interest to the five living Claimant railroad workers and the estates of the remaining 27, all of whom have waited over 35 years and some of whom have waited over 40 years to recover what is due them.

VII.

In conclusion, the Reorganized Company, formerly known as The Penn Central Corporation and now known as American Premier Underwriters, Inc., is liable to Claimants for the judgment, including prejudgment interest, entered in the United States District Court for the Northern District of Ohio.  Accordingly, the motion of the Claimants for summary judgment will be granted and the motion of the Reorganized Company for summary judgment will be denied.

-46-